# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ELIZABETH ADKISON,                             Case No. 1:10-cv-85

      Plaintiff,                            Judge Timothy S. Black

vs.

THE PROCTER & GAMBLE COMPANY,

      Defendant.

## ORDER DENYING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT (Doc. 43)

This civil action is currently before the Court on Defendant's Motion for Summary

Judgment and Statement of Proposed Undisputed Facts (Doc. 43), the Plaintiff's

Memorandum in Opposition (Doc. 51) and Response to Defendant's Proposed

Undisputed Facts and Plaintiff's Proposed Disputed Facts (Doc. 52), the Defendant's

Reply Memorandum (Doc. 78), and the Plaintiff's Sur-reply (Doc. 81).  Upon careful

review of the facts and law, and for the reasons set forth herein, Defendant's Motion for

Summary Judgment is hereby **DENIED** (but for as to the claim for FMLA interference[1]).

---

[1] Plaintiff does not oppose dismissal of her claim for FMLA interference (Doc. 43, Ex. 1 at 57; Doc. 51 at 11, n. 4), and, accordingly, Defendant is granted judgment dismissing that claim.

## I.     BACKGROUND

Plaintiff Elizabeth Adkison is a former employee of Defendant Procter & Gamble.

(Doc. 1 at ¶ 22).  In February 2010, Plaintiff brought suit against Defendant alleging

claims for interference with Plaintiff's Family and Medical Leave Act (FMLA) rights,

FMLA retaliation, gender discrimination, and retaliation for gender discrimination

complaints.  (*Id*. at ¶ 73-99).

### A.     UNDISPUTED FACTS[2]

### Procter & Gamble's Employment Practices

1.      There are generally four progressive career levels for Procter & Gamble
        marketing employees:
        - An entry level marketer is an Assistant Brand Manager ("ABM")
          and is classified as a level two, known as "Band 2."
        - An ABM may be promoted to a Brand Manager position (Band 3).
        - The next level is an Associate Marketing Director position ("AMD")
          (Band 4).
        - The next level is Marketing Director ("MD") (Band 5).
        - Ultimately, the highest position in marketing is a General Manager
          ("GM") (Band 6).  (Doc. 43, Ex. 2 at ¶ 4).

2.      Progressing from ABM to a General Manager position takes roughly 17-20
        years.  (*Id*. at ¶ 6).

3.      Each year, Brand Managers, in conjunction with their direct supervisors,
        complete a Work & Development Plan ("W&DP").  The W&DP generally
        includes a review of the employee's results, written by the employee, over
        the prior 12 months; a section detailing the employee's strengths and
        opportunities, which is written by the manager and based on both the
        manager's perception and Broad Based Feedback (BBF) solicited from
        people identified by both the Brand Manager and her manager.  (*Id*. at ¶ 7).

---

[2] The undisputed facts are gleaned from the parties' filed statements regarding the
undisputed facts.  *See* Docs. 43 and 52.

4.    To assess performance relative to peers, Brand Managers are measured
      against one another annually at a "calibration session." (*Id.* at ¶ 8).

5.    During the calibration session, Brand Managers are assigned a rating of 1,
      2, or 3. Ratings are assigned according to a forced distribution system such
      that the top 15-20 percent of the Brand Managers may receive a 1 *(very best
      performers - consistently exceeds expectations*); 74% receive a 2+ or a 2-[3]
      (*key contributors - consistently meet expectations and at times exceed
      some*); the bottom 6% receive a 3 (*least effective contributors - Do not
      consistently meet expectations*). (*Id.* at ¶ 9).

6.    Prior to the calibration session, the Brand Manager's direct manager
      submits a proposed rating for his or her direct report(s). (*Id.* at ¶ 10).

7.    During the calibration session, managers reach agreement on the final
      rating, according to the distribution above, for Brand Managers based upon
      the knowledge of the Brand Managers in the group, a review of the Brand
      Manager's W&DP and input from the Brand Manager's direct manager.
      (*Id.* at ¶ 11).

8.    Procter & Gamble requires that certain skills be in place prior to promoting
      an employee from Brand Manager to Associate Marketing Director.
      Promotions are linked to performance, which is measured in two ways:
      business results and organizational results. (*Id.* at ¶ 13).

**Plaintiff's Work in Oral Care and 2006 Maternity Leave**

9.    Plaintiff attended Taylor University in Upland, Indiana. She graduated in
      1996 with a dual degree: a Bachelor of Science in business administration
      and a Bachelor of Science in Accounting. Plaintiff was hired as a
      Purchasing Manager in Procter & Gamble's Purchasing Department on
      June 24, 1996. (*Id.* at ¶ 16).

10.   In 2000, Plaintiff transferred to the Marketing Division where she worked
      as an Assistant Brand Manager, North American Design and Delivery from
      approximately June 2000 until March 2002. Plaintiff then worked as an

---

[3]Defendants claim that regardless of whether the rating is a 2+ or a 2-, the official rating
shows up only as a "2." (Doc. 43, Ex. 2 at ¶ 2). Plaintiff disputes that contention, and claims
that all Planning Session/Calibration documents include official ratings which are depicted as 2-
and 2+. (Doc. 52 at ¶ 9).

Assistant Brand Manager on Crest Toothbrushes from March 2002 until her first maternity leave in January 2003. (*Id.* at ¶ 17).

11. In January 2003, Plaintiff took the first of her four maternity leaves of absence. Plaintiff returned in May 2003 from her first maternity leave. (*Id.* at ¶ 18).

12. In November 2003, Plaintiff was promoted to a Brand Manager position in Procter & Gamble's Oral Care organization. (*Id.* at ¶ 19).

13. Plaintiff began her second maternity leave in July 2004. While out on leave, Plaintiff accepted a role as Brand Manager in Crest Professional and Consumer Credentialing: a role she assumed upon her return from maternity leave in November 2004. (*Id.* at ¶ 20).

14. The Oral Care organization launched the Crest Whitestrips ("CWS") product in 2001 and it became a highly successful product. (*Id.* at ¶ 21).

15. By 2005, however, the CWS business was in significant decline. In fiscal year 2004-2005, the CWS business had declined 26% - a level of decline that was highly unusual in consumer goods. As a result, there was significant personnel turnover, numerous agency meetings and a number of discussions centered on whether or not CWS would continue to be a viable business. (*Id.* at ¶ 22).

16. The Design role and its significance can be described as follows: sale of consumer goods is largely driven by having superior products that meet the consumer's needs. Designing responsive products takes time, significant expense, and extensive cross functional work. Research and development is therefore critical. In addition, a product that will need to be manufactured will need to work in the supply chain. Therefore, there must be a cross-functional team to make sure the products are made at a profit and that there is sufficient growth in the future to maintain share and profitability growth and contribute to the bottom line of the company. (*Id.* at ¶ 24).

17. The delivery role includes working with retailers and agencies and developing marketing execution. Delivery also includes a certain amount of operations work such as making sure that the factories are running and producing enough products and that the products are getting to the retailers. (*Id.* at ¶ 25).

18. In January 2006, Plaintiff told her immediate supervisor, David Dintenfass, that she was pregnant and intended to take a twelve (12) week maternity leave. (*Id.* at ¶ 30).

19. Dintenfass then advised his supervisor, Diane Dietz, that Plaintiff was expecting a child. (*Id.* at ¶ 31).

20. Dintenfass, Dietz, and Ros Bolden of Human Resources had a series of discussions to determine how to cover Plaintiff's maternity leave in a way that was best for both Plaintiff and the CWS business. (*Id.* at ¶32).[4]

21. Dietz and Dintenfass determined that they could not leave Plaintiff's Delivery role, the role responsible for day-to-day decisions on the business, open for 12 weeks. (*Id.* at ¶ 33).[5]

22. Dintenfass and Dietz understood that if they backfilled Plaintiff's role, their responsibility was to ensure that Plaintiff returned to an equivalent role within Procter & Gamble. (*Id.* at ¶ 34).

23. Dietz, Pierce, Dintenfass and Bolden determined that when Plaintiff went out for leave, Sunny Jain, who held the role of Design Brand Manager in Crest Whitestrips, would assume Plaintiff's Delivery role and that Plaintiff would return to Jain's Design role. (*Id.* at ¶ 35).

24. When Dietz, Dintenfass, and Bolden presented this option to Plaintiff in March 2006, however, Plaintiff was not amenable. Plaintiff requested to return to the Delivery role and asked that her Delivery role be held open for the duration of her leave. (*Id.* at ¶ 37).

25. A few weeks later, on April 3, 2006, Plaintiff, in writing, proposed an alternative plan to Dietz, Dintenfass, and Bolden under which Plaintiff would take only eight weeks of leave and then return to the Delivery Brand Manager role. (*Id.* at ¶ 38).

---

[4] Defendant asserts that Charlie Pierce, President of the Oral Care business, also participated in these discussions. (Doc. 42, Ex. 2 at ¶ 32). Plaintiff disputes Pierce's participation. (Doc. 52 at ¶ 32).

[5] Defendant asserts that Charlie Pierce also participated in this determination. (Doc. 42, Ex. 2 at ¶ 33). Plaintiff disputes Pierce's participation. (Doc. 52 at ¶ 33).

26.  Initially, Dietz, Dintenfass, and Bolden rejected Plaintiff's proposal and encouraged Plaintiff to take the full 12 weeks of leave. (*Id.* at ¶ 39).

27.  Dietz, Dintenfass, and Bolden eventually agreed to Plaintiff's proposal with the caveat that Plaintiff and Jain would rotate positions the next year, in July 2007. (*Id.* at ¶ 40).

28.  Plaintiff went out for her third maternity leave in June 2006 and returned to the Delivery role eight weeks later on a part-time basis, under the plan Plaintiff had proposed to Dietz, Dintenfass, and Bolden. (*Id.* at ¶ 43).

29.  Plaintiff and Jain were scheduled to officially rotate roles on July 1, 2007. Dintenfass and Dietz began transferring projects as early as March 2007. (*Id.* at ¶ 44; Doc. 52 at ¶44).

## Plaintiff's work in Global Vicks

30.  In September 2006, Holli Christman, became the Marketing Director of Global Vicks, a division of the Health and Well Being organization. (*Id.* at ¶ 45).

31.  Christman interviewed and hired Plaintiff as a Brand Manager in a Design Role in Global Vicks in May 2007. Prior to hiring Plaintiff, Christman spoke with Plaintiff's then current supervisor, Dintenfass, and Plaintiff's mentor, Clark Reinhard. (*Id.* at ¶ 46).

32.  When initially approached by Christman, Dintenfass was very supportive of Adkison moving to Vicks. (*Id.* at ¶ 47; Doc. 52 at ¶ 47).

33.  Reinhard advised Christman that he considered Plaintiff to be an incredibly talented Brand Manager who was in a difficult position with her then current manager, David Dintenfass. (*Id.* at ¶ 48).

34.  Reinhard said it would be good for Plaintiff to work with Christman but also stated that Plaintiff could be "high maintenance." Though Christman does not recall Reinhard's exact language, he implied that Plaintiff and Dintenfass were like oil and water: two very smart people who could not find a way to work together effectively. Reinhard did not fully explain what he meant by "high maintenance," he just stated that Plaintiff would

require a lot of Christman's time and energy as Plaintiff moved through her work life. (*Id.* at ¶ 49).

35. Christman testified that two things led her to choose Plaintiff for the Design role over other candidates. First, Plaintiff had significant experience and very good results. Christman had heard good things about Plaintiff's skills, her project work and the work Plaintiff had delivered in Oral Care. Second, Christman liked Plaintiff and wanted to help her. Christman saw someone who was exceptionally bright, very good at what she did and stuck in what Christman believed to be a bad situation. (*Id.* at ¶ 50).

36. Bolden directed Christman to draft Plaintiff's 2007 W&DP and review it with her prior manager, Dintenfass. (*Id.* at ¶ 51; Doc. 52 at ¶ 51).

37. Upon reviewing the Broad Based Feedback and business results from Plaintiff's work in Oral Care, Christman believed that Plaintiff deserved a "1" recommendation and advised Dintenfass of the same. Dintenfass requested an in-person meeting to discuss the rating. (*Id.* at ¶ 52).

38. Christman met with Dintenfass and Bolden to discuss the ratings. Dintenfass told Christman and Bolden that he could not support a "1" recommendation for Plaintiff because while Plaintiff's results were strong, the way in which she obtained those results was not consistent with being a "1" performer. (*Id.* at ¶ 53).

39. Christman left the meeting frustrated an in tears. She believed she had a very talented woman working for her whose results and Broad Based Feedback supported a "1" recommendation, but that the sending organization would not align to that recommendation. Dintenfass would only say that the manner in which Plaintiff obtained her results could be disruptive to the organization. (*Id.* at ¶ 55).

40. After the meeting, Christman pulled Bolden aside to speak privately. Christman asked whether Dintenfass's perspective was "a David thing" or whether it was real. Bolden responded that it was real, and told Christman that although Plaintiff often obtained good results, the way that Plaintiff got them was frequently disruptive and damaging to the organization. (*Id.* at ¶ 56).

41. During the 2007 Personal Health Care Brand Manager calibration session, Christman presented Plaintiff to the other Directors. She advised them that based upon Plaintiff's results and Broad Based Feedback, she had wanted to recommend Plaintiff for a "1" rating but that she (Christman) did not have the support of the sending organization, Oral Care. (*Id.* at ¶ 58).

42. Christman does not recall how many other Brand Managers were calibrated in Personal Healthcare but does recall that the two individuals who received "1" ratings that year were two females: Karen Schlosser and Tara Stealey. (*Id.* at ¶ 60).

**Plaintiff's Application for an AMD position in Oral Care**

43. Later in 2007, Plaintiff applied for a Band 4, Associate Marketing Director position in the Oral Care Professional Organization. (*Id.* at ¶ 61).

44. Plaintiff's application was prompted by a request from David Hull, a recently promoted Director in the sales division of the Oral Care Professional organization, who had previously worked with Plaintiff. (*Id.* at ¶ 62).

45. Hull in turn advised his supervisor, Bill Toler, the hiring manager, that he thought Plaintiff would be a good fit for the role. Toler, however, never directed Hull to contact Plaintiff or ask Plaintiff to apply. (*Id.* at ¶ 63).

46. Although the Associate Marketing Director position was a Band 4 role, Toler was willing to consider Band 3 applicants if they met two requirements: 1) Band 3 applicants had to have either been in their current role for 18 months or more or have approval from their current managers to leave the role and 2) band 3 applicants had to be on the Ready Now/Promote Now list, meaning that they were deemed eligible for promotion to Band 4 by the Marketing Organization.[6] (*Id.* at ¶ 64).

47. Toler did not consider Plaintiff for the role because Plaintiff did not meet the above qualifications. (*Id.* at ¶ 65).

---

[6] Plaintiff maintains that Toler manufactured the second requirement to preclude Plaintiff's eligibility. (Doc. 53 at ¶ 64).

48.     Toler ultimately selected Dennis Legault for the role. Legault was a Band 3 marketer who met the above criteria. (*Id.* at ¶ 66)

**Plaintiff's Work with Holli Christman**

49.     Christman claims she first began experiencing problems with Plaintiff in late 2007/early 2008.[7] (*Id.* at ¶ 67).

50.     In January 2008, Plaintiff told Christman that she was pregnant and would be taking leave. (*Id.* at ¶ 72).

51.     In light of Plaintiff's upcoming leave, Christman met with Plaintiff and suggested that they begin Plaintiff's W&DP early so that it could be completed prior to Plaintiff's maternity leave. Christman believed that Plaintiff would have a strong W&DP that year and wanted to ensure that it was in place prior to Plaintiff's leave. (*Id.* at ¶ 73).

52.     In April 2008, Christman asked Plaintiff to provide a list of individuals from whom Broad Based Feedback could be solicited. (*Id.* at ¶ 74).

53.     Upon reviewing Plaintiff's proposed list for Broad Based Feedback, Christman noted that plaintiff did not include any names of her regional counterparts, a critical customer for a global role like Plaintiff's. Christman asked Plaintiff to add a regional counterpart and Plaintiff complied by adding Tara Stealey from the North America regional team. (*Id.* at ¶ 75).

54.     After her discussions with Stealey, Luis, and Brown, Christman discussed their feedback with Clark Reinhard and Laurie Streitmatter of Human Resources. Christman consulted with Reinhard because he was Plaintiff's mentor and someone whom Christman deeply respected. Christman knew that the feedback Plaintiff was about to receive would be difficult Plaintiff to navigate so Christman wanted Reinhard to be aware of the situation so that he would be prepared to coach and mentor Plaintiff if Plaintiff decided to go to him. (*Id.* at ¶ 81).

---

[7] Plaintiff disputes Christman's time frame. Plaintiff asserts that Christman first informed her that she had problems with her performance on the last day the two were in the office together prior to Adkison's maternity leave in June 2008. (Doc. 53 at ¶ 67).

55. Christman also conferred with her manager Leigh Radford, who joined the Global Vicks organization as the Brand Franchise Leader (General Manager equivalent) in 2008. Radford advised Christman to enroll Human Resources, to continue to seek, understand, and follow up on the feedback she had received, and to ensure that Plaintiff was getting the proper feedback. (*Id.* at ¶ 82).

56. Christman discussed the issue with Human Resources manager Laurie Streitmatter who advised Christman that this was a serious issue that placed Plaintiff off track for promotion and that Christman should be honest with Plaintiff about the issue. (*Id.* at ¶ 83).

57. Christman met with Plaintiff in early June 2008 to review the Broad Based Feedback Plaintiff had received. Christman walked through all of the positive feedback and things that Plaintiff continued to do well. Christman then raised the performance issues that had been identified and advised Plaintiff that it was a big deal, critical to Plaintiff's success at the next level, and something that had to be addressed.[8] (*Id.* at ¶ 84).

58. Plaintiff's W&DP was not completed prior to taking maternity leave. (*Id.* at ¶ 88).[9]

59. While Plaintiff was on maternity leave, Dintenfass joined the Global Vicks organization. (*Id.* at ¶ 89).

60. Radford learned from Christman that Plaintiff did not have a good working relationship with Dintenfass. Radford reached out to Dietz, Dintenfass's General Manager to get additional perspective on Plaintiff's relationship with Dietz. Dietz advised Radford that the issue was beyond Dintenfass

---

[8] Plaintiff denies that Christman shared any feedback from Basuri or Brown in this meeting. (Doc. 52 at ¶ 84).

[9] Plaintiff alleges that Defendant prevented the completion of the report prior to her maternity leave by failing to provide the Broad Based Feedback until a week before Plaintiff's leave. (Doc. 52 at ¶ 88).

and that there were broader issues. (*Id.* at ¶ 90).[10]

61.   In December 2008, after her return from leave, Plaintiff applied for a Band 3 Brand Manager position in Procter & Gamble's Household Care-Fabric Care division without first telling her manager, Christman. (*Id.* at ¶ 92).

62.   The hiring manager, Daniel Epstein, reviewed Plaintiff's past WD&Ps and conferred with Christman and Brown regarding Plaintiff's work performance and her alleged collaboration problems. (*Id.* at ¶ 93).

63.   Epstein interviewed Plaintiff twice and asked Plaintiff to reflect on the collaboration issues she had in the past. After talking with Plaintiff, Epstein was of the opinion that Plaintiff refused to take responsibility for her prior collaboration issues. Epstein testified that Plaintiff had not learned anything and had not grown professionally as a result of the incidents with Tim Brown or after having had her collaboration issues pointed out to her. (*Id.* at ¶ 94).

64.   Epstein decided not to hire Plaintiff for the role reported his observations to Christman. (*Id.* at ¶ 95).

### Plaintiff's PIP and Termination

65.   On May 28, 2009, Radford offered Plaintiff both a Performance Improvement Plan (PIP) and a voluntary separation package due to what Radford perceived as Plaintiff's deficiencies. (*Id.* at ¶ 98).

66.   Procter & Gamble's Legal Department is usually involved in PIPs in that the Legal Department is aware that there is a concentrated discussion about an employee and the Legal Department seeks to ensure fairness in the PIP document. Radford received confirmation from Human Resources that Plaintiff's PIP had been cleared by Procter & Gamble's Legal Department. (*Id.* at ¶ 99).

67.   Radford strongly urged Plaintiff to take the voluntary separation package. (*Id.* at ¶ 101).

---

[10] Plaintiff argues that a jury could infer that Dietz and Dintenfass told Radford about Adkison's complaints of discrimination and FMLA interference while in Oral Care. (Doc. 52 at ¶ 90)

68.   Christman was offered and accepted a separation package in February 2009. Christman left Procter & Gamble in June 2009. (*Id.* at ¶ 102). Radford offered Christman a separation package in part because of Radford's belief that it would be very difficult for Christman to be promoted to a General Manager position. (*Id.* at ¶ 102).

69.   After Christman's departure, Radford decided that Plaintiff should report directly to her for two reasons. First, Radford was aware of Plaintiff's concerns with Dintenfass and wanted to ensure that Plaintiff had the best possible reporting relationship. Second, because of the concerns with Plaintiff's performance deficiencies,[11] a direct reporting relationship was a good way for Radford to have complete visibility of Plaintiff's performance. (*Id.* at ¶ 103).

70.   On June 22, 2009, Radford and Leslie Ryan (who had replaced Laurie Streitmatter as the Human Resources Manager for Global Vicks) met with Plaintiff for her first 30-day check-in. (*Id.* at ¶ 106).

71.   Radford shared her concerns with Plaintiff that Plaintiff was failing to enroll management in her projects. (*Id.* at ¶ 107).

72.   Plaintiff told Radford that she disagreed with the feedback. Radford told Plaintiff that despite Plaintiff's best efforts, Plaintiff was not competitive with her peers. Both Radford and Ryan encouraged Plaintiff to seriously consider taking the separation package. (*Id.* at ¶ 108).

73.   Two days later, on June 24, 2009, Plaintiff's attorney sent a letter addressed to Procter & Gamble Associate General Counsel Mark S. Krass, alleging discrimination and demanding that Plaintiff be removed from the "arbitrary PIP." (*Id.* at ¶ 109).

74.   Radford, Ryan, and Plaintiff later met for Plaintiff's 60-day PIP check-in. Radford shared Plaintiff's W&DP Broad Based Feedback with Plaintiff. Radford highlighted the positive feedback Plaintiff received with respect to engagement with her team, her strong strategic thinking of her projects, and her functional mastery. Radford reiterated to Plaintiff that when Plaintiff has clear management alignment and engages early on expectations, Plaintiff delivered strong results. (*Id.* at ¶ 110).

---

[11]  Plaintiff disputes that she had any performance deficiencies. (Doc. 53 at ¶ 103).

75.    Radford also shared that although she saw Plaintiff as a good manager/leader of projects and initiatives, she did not see Plaintiff as a leader that engaged, energized, or enabled. (*Id.* at ¶ 111).

76.    Radford again shared her view that Plaintiff remained uncompetitive among her peers. Radford then offered to provide Plaintiff with a contact who was excellent at enrolling and engaging management for strategic alignment. (*Id.* at ¶ 113).

77.    On August 31, 2009, Plaintiff again met with Radford and Ryan for the 90-day PIP check-in. During the check-in, they reviewed Plaintiff's 2009 W&DP. Radford shared her belief that it might take longer than 90 days to assess whether Plaintiff had made the necessary progress against her PIP. (*Id.* at ¶ 114).

78.    Radford advised Plaintiff that she wanted to give Plaintiff every opportunity to demonstrate her progress and needed additional time to make a final assessment. Radford shared that if Plaintiff was not interested in an extension of the PIP, Radford would recommend termination based on Plaintiff's lack of competitiveness with her peers. Radford asked Plaintiff if she wanted to accept the three-month extension of her PIP; Plaintiff accepted. At Plaintiff's request, they agreed to resume the 90-day check-in on the next day. (*Id.* at ¶ 115).

79.    The following day, September 1, 2009, Plaintiff, Radford, and Ryan met to continue their discussion regarding Plaintiff's 2009 W&DP and Plaintiff's 90-day check-in. Plaintiff began to read talking points which included Plaintiff's claim that: Purpose Value Principles (PVP) violations had occurred; that she was the victim of gender and maternity discrimination in Oral Care; that she was purposefully being excluded from key marketing meetings, marketing group luncheons, and important project work; and that David Dintenfass had influenced Radford against her and that there was "no pull" for her in the marketing function because of David Dintenfass and what happened to her in Oral Care. (*Id.* at ¶ 116).

80.    Radford did not discuss the details of Plaintiff's discrimination complaint with Plaintiff, but instead, immediately advised Human Resources that Plaintiff had complained of discrimination. (*Id.* at ¶ 119)

81. Human Resources manager Laura Kingsley was asked to conduct an independent fact-finding investigation regarding the discrimination claims made by Plaintiff at the September 1, 2009 meeting with Radford and Ryan. (*Id.* at ¶ 120).

82. Kingsley interviewed 15 individuals and concluded that Plaintiff's claims of gender discrimination were unsubstantiated.[12] (*Id.* at ¶ 121).

83. After consulting with Ryan, Radford recommended a 2- rating for Plaintiff for the 2009 calibration session. (*Id.* at ¶ 122).

84. On September 10, 2009, both Radford and Ryan telephoned in to the Marketing calibration session so that Radford could represent Plaintiff as Plaintiff's manager. Radford reviewed with the session members Plaintiff's strong business results and discussed Plaintiff's strengths and opportunities and shared that her overall recommended rating for Plaintiff was 2-. (*Id.* at ¶ 123).

85. On September 17, 2009, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging sex discrimination and retaliation. (*Id.* at ¶ 124).

## B.    Procedural History

Plaintiff filed an Amended Complaint on June 25, 2010 alleging that Defendant

Procter & Gamble engaged in unlawful discrimination. Specifically, Plaintiff brought

claims alleging (1) FMLA interference in violation of 29 U.S.C. 2611 and 29 CFR

825.120 (Count I); (2) FMLA retaliation in violation of 29 U.S.C. 2601 et seq. (Count II);

(3) gender discrimination in violation of Ohio Rev. Code Ann. 4112 et seq. (Count III);

(4) gender discrimination in violation of Title VII, 42 U.S.C. 2000 (Count V); and (5)

---

[12] Plaintiff alleges that Kingsley's investigation primarily consisted of interviewing Procter & Gamble employees about whom Plaintiff had complained and that Kingsley failed to explore events relevant to the issues of retaliation and discrimination. (Doc. 52 at ¶ 121).

unlawful retaliation for making complaints of discrimination in violation of Ohio Rev.

Code Ann. 4112.99 and 42 U.S.C. 2000 *et seq*. (Counts IV and VI). (Doc. 23 at ¶¶ 77-

116.)

On September 19, 2011, Defendant filed a Motion for Summary Judgment (Doc.

43). The Plaintiff filed a Response in Opposition (Doc. 51), the Defendant filed a Reply

(Doc. 78), and the filed Plaintiff a Sur-reply (Doc. 81).

## II.     STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986). The moving party has the burden of showing the absence of genuine

disputes over facts which, under the substantive law governing the issue, might affect the

outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be

construed in a light most favorable to the party opposing the motion. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere

allegations or denials of his pleading, but . . . must set forth specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505 (1986).

## III.    ANALYSIS

Defendant seeks summary judgment on Plaintiff's claims alleging that (1) her 2007

reassignment in Oral Care resulted from illegal FMLA retaliation; (2) she was denied a

2008 promotion to the position of Associate Brand Manager in Oral Care as a result of

gender discrimination and/or retaliation for her protected Title VII activity; and (3) she

was terminated as a result of gender discrimination, retaliation for her protected Title VII

activity, and/or retaliation for her protected FMLA activity.[13]

Each of Plaintiff's claims is evaluated under the three-part burden shifting

framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[14]

Under the first step, the plaintiff bears the initial burden of establishing a *prima facie* case

by a preponderance of the evidence. *See McDonnell Douglas,* 411 at 802; *White v.*

---

[13] Defendant also claims that Plaintiff has "abandoned any discrimination or retaliation claim arising out of: (1) Plaintiff's alleged exclusion from a meeting where she was not a team member; (2) Plaintiff's alleged exclusion from projects; (3) Plaintiff's performance ratings; (4) Plaintiff's denial of the lateral Brand Manager position in Fabric Care; (5) Plaintiff's Performance Improvement Plan ("PIP"), separate from her termination; and (6) denial of promotion to North American Professional Oral Care AMD." (Doc. 78 at 8). However, the Court reads Plaintiff's references to the first five of these events as evidence of protected activity rather than claims in and of themselves, and summary judgment is therefore inappropriate. (*See* Doc. 51 at 36-38). And, rather than abandoning her claim of gender discrimination and retaliation with respect to the denial of the promotion to Professional Oral Care AMD, Plaintiff has made specific arguments of gender discrimination and retaliation. (Doc. 51 at 20, 53).

[14] *See Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) (Title VII discrimination claims); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997) (Title VII retaliation claims); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (FMLA retaliation claims); *Little Forest Med. Ctr. Of Akron v. Ohio Civ. Rights Comm'n*, 575 N.E.2d 1164 (cases brought under Ohio Rev. Code § 4112 are analyzed in the same manner as cases brought under Title VII).

*Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).  By establishing a *prima facie* case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against them.  *EEOC v. Avery Dennison Corp.*, 104 F.3d 838, 861 (6th Cir. 1997).  Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the decision.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant meets this burden, then the presumption created from the *prima facie* case drops out and plaintiff has "an opportunity to prove . . . that the proffered reasons were not the true reason for the employment decision, but were a pretext for discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981).

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry."  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).  While the burden of production may shift during the stages of the inquiry, the burden of persuasion remains with the Plaintiff throughout the analysis. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007*)*.

### A.    Plaintiff's 2006 Maternity Leave and Reassignment of her Duties

#### 1.    *Prima Facie* Case

Plaintiff argues that Procter & Gamble's plan to have Sunny Jain take over her role as Delivery Brand Manager for the Crest Whitestrips organization and the transfer of her

responsibilities to Jain beginning in March 2007 constitutes FMLA retaliation.  (Doc. 51 at 32).  To state a *prima facie* case of FMLA retaliation, Plaintiff must establish that (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of her exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

For purposes of summary judgment, Defendant does not challenge that Plaintiff met the first two prongs of the test by taking FMLA leave.  (*See* Doc. 43, Ex. 1 at 29-30). Instead, Defendant argues that Adkison cannot meet the requirements of a *prima facie* case because she cannot demonstrate that the proposed role rotation constituted an adverse employment action.  (Doc. 43, Ex. 1 at 29-30).

First, Defendant argues that its plan to have Jain and Adkison rotate roles in July 2007 was never consummated because Plaintiff transferred to a position in the Global Vicks organization in May 2007.  (*Id.* at 30).  Defendant cites *Farra v. Gen. Motors Corp.*, 163 F. Supp. 2d 894 (S.D. Ohio 2001) and *Berryman v. SuperValu Holdings*, Inc. 2010 WL 1257845 (S.D. Ohio Mar. 31, 2001) for the proposition that an "unconsummated threat to transfer an employee to a different position is insufficient, as a matter of law, to constitute a materially adverse employment action."  (Doc. 43, Ex. 1 at 30).

-18-

In response, Plaintiff argues that *Farra* and *Berryman* are materially distinguish-able from the facts in this case, and the Court agrees. In *Farra*, the court held that the employer's threat to transfer the employee to another position was not an adverse employment action because there was "no evidence that [the defendant's] threat was consummated." *Farra*, 163 F. Supp. 2d at 911. Similarly, in *Berryman*, the court found that an employer's mere threats to discipline an employee, without any actions taken to consummate those threats, were insufficient. *Berryman*, 2010 WL 1257845, *12 (S.D. Ohio Mar. 31, 2010).

In the instant case, Adkison has provided evidence that Dintenfass began transferring her responsibilities to Jain in March 2007, several months before Plaintiff moved to Vicks. (Doc. 51 at 39).[15] Dintenfass began assigning Jain projects including developing marketing media and advertising plans for fiscal year 2007/2008, and some of Adkison's subordinates began then reporting to Jain. (*Id*. at 18). Unlike the situations in *Farra* and *Berryman*, Defendant's actions were more than an unconsummated threat. Here, Defendant took tangible steps to transfer Adkison's responsibilities to Jain as early as March 2007. While Adkison did not assume Jain's role, Defendant did reassign her work and diminish her responsibilities, therefore taking an adverse employment action.

---

[15] Defendant argues that even if the 2006 announcement of the plan to rotate Jain and Adkison constitutes an adverse action, it is time barred. (See Doc. 78 at 13). But Defendant makes no argument that the actual transfer of duties to Jain in March of 2007 is time barred.

Defendant next argues that even if the role rotation is more than a mere threat,
Plaintiff cannot establish that it was an adverse employment action. (Doc. 43, Ex. 1 at
31). An adverse employment action is a "materially adverse change in the terms and
conditions of [plaintiff's] employment because of the employer's conduct. *Smith v. City
of Salem*, 378 F.3d 566, 575-76 (6th Cir. 2004). Such an action is typically characterized
"by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or]
significantly diminished material responsibilities." *Momah v. Dominguez*, 239 F. Appx
114, 123 (6th Cir. 2007) (citing *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).
While Defendant correctly notes that a "purely lateral transfer" is not a materially adverse
action, Adkison's reassignment was not purely lateral. While the Crest Whitestrips
Delivery and Design Brand Manager positions had the same title, pay, and benefits,
Adkison has presented evidence that the roles offered significantly different
responsibilities. (See Doc. 43, Ex. 1 at 31; Doc. 51 at 14). As a Delivery Brand Manager,
Adkison performed both delivery and design work while supervising five direct reports.
(Doc. 51 at 14). In contrast, the Design Brand Manager position directly supervised only
one employee and performed only design work. (*Id.*) Contrary to Defendant's assertion
that Plaintiff has provided only her subjective opinion that the Design role was inferior,
several Procter & Gamble employees testified that the Design role was more appropriate
for a more junior staffer. (*See* Doc. 60 at 20; Doc. 50, Ex. D). The Court accordingly
finds sufficient facts to present a genuine issue of whether Plaintiff suffered an adverse
employment action.

Finally, Defendant argues that Plaintiff cannot produce evidence to satisfy the fourth prong of the *prima facie* case by showing a causal connection between Adkison's exercise of her FMLA rights and the adverse employment action. (Doc. 43, Ex. 1 at 33). Procter & Gamble claims that the "undisputed record evidence establishes that even before Plaintiff requested maternity leave, Oral Care management intended to have Plaintiff and Jain rotate roles." (*Id*. at 33). This is simply not true. Defendant relies on the testimony of Dintenfass and Bolden that they planned to rotate Plaintiff and Jain all along, while Plaintiff and Jain himself both testified that they were not told of the plan until after Plaintiff stated her intention to take maternity leave. (See Doc. 62 at 40; Doc. 66 at 21; Doc. 56 at 35). The Court finds a genuine issue of dispute regarding a causal connection between Plaintiff's maternity leave and Procter & Gamble's role rotation.

Plaintiff has established genuine issues of material fact concerning whether she suffered an adverse employment action and whether such action was causally related to her maternity leave. Accordingly, the Court finds that Plaintiff has met the low hurdle to establish a *prima facie* case of FMLA retaliation.

### 2. Procter & Gamble's Legitimate Non-Discriminatory Reason

Because Plaintiff has set forth a *prima facie* case for FMLA retaliation, the burden shifts to the Defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Bryson v. Regis-Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Procter & Gamble must clearly set forth, through the introduction of admissible evidence,

reasons for its actions, which, if believed by the trier of fact would support a finding that unlawful discrimination was not the cause of the employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). This is merely a burden of production, not of persuasion, and the employer's burden is satisfied if it simply explains what it has done or produces evidence of legitimate nondiscriminatory reasons. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009); *Bd. Of Trs. Of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25, n.2 (1978).

Defendant has met this standard. Procter & Gamble states that it planned to rotate Plaintiff and Jain for the needs of the business and the career development of both Adkison and Jain. (Doc. 43, Ex. 1 at 33). Defendant claims that it was critical that Brand Managers obtain both design and delivery experience at the Brand Manager level before progressing to the next level. (*Id.* at 34). Further, Defendant asserts that "the critically volatile state of the Crest Whitestrips business at the time Plaintiff contemplated being out on leave made it impossible to leave the Delivery role open during Plaintiff's leave of absence." (*Id.*). Defendant has therefore met its burden to set forth a legitimate non-discriminatory reason for the adverse employment action.

### 3. Plaintiff's Evidence of Pretext

Once Defendant has set forth a legitimate non-discriminatory reason for the adverse employment action, the burden then shifts back to Plaintiff to provide evidence that Defendant's reason is a pretext for discrimination. *Bryson v. Regis Corp.*, 498 F.3d

561, 570 (6th Cir. 2007). Plaintiff must produce evidence "tending to show" that

Defendant's proffered reason for the adverse employment action was false. *Skrjanc. v.*

*Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Such a showing of

pretext may be accomplished by showing that the articulated reason (1) has no basis in

fact; (2) did not actually motivate Defendant's conduct; or (3) was insufficient to warrant

the challenged conduct. *Dewes v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

The Sixth Circuit has cautioned, however, that the courts should "avoid formalism" in the

application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.*,

580 F.3d 394, 400, n. 4 (6th Cir. 2009). Pretext is a "commonsense inquiry" and at the

summary judgment stage Plaintiff need only produce evidence from which the jury could

reasonably doubt the employer's explanation. *Id*.

Plaintiff has provided sufficient facts to cast doubt on Procter & Gamble's

proffered reason for giving her position to Jain. Defendant never articulated its plan to

move Jain into the design role until after Plaintiff requested maternity leave.

Additionally, Plaintiff has testified that Defendant told her they were making the position

to further develop Jain's career, and that she was never told that experience in both

delivery and design at the Brand Manager level was necessary for further promotion.

(Doc. 51 at 46). Finally, other Procter & Gamble employees have testified that company

policy in place in 2007 did not reflect Procter & Gamble's articulated reason. (*See* Doc.

60 at 20).

-23-

The Court finds that Plaintiff has met her burden to set forth a *prima facie* case of FMLA retaliation and has provided sufficient evidence that Defendant's articulated reason for its adverse action was mere pretext. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim of FMLA retaliation concerning her 2006 maternity leave and the 2007 reassignment of her duties is **DENIED**.

### B.      Oral Care Associate Marketing Director Position

Plaintiff also argues that she was denied a promotion to Associate Marketing Director for Oral Care in early 2008 as a result of gender discrimination and/or retaliation for engaging in protected Title VII activity. (Doc. 51 at 34). Like Plaintiff's claims concerning her 2006 maternity leave, all of Plaintiff's claims concerning the denial of her promotion are analyzed under the *McDonnell Douglas* burden shifting framework. *See Burdine*, 450 U.S. 252-253; *Little Forest Med. Ctr. of Akron,* 575 N.E.2d at 1167.

#### 1.      *Prima Facie* Case

##### a.      Gender Discrimination

To state a *prima facie* case for gender discrimination in the denial of a promotion, Adkison must demonstrate that: (1) she belongs to a protected class; (2) she applied for and was qualified for employment; (3) despite her qualifications, she was denied employment, and (4) persons outside the class with substantially similar or lesser qualifications received the jobs. *McDonnell Douglas*, 411 U.S. at 802. Procter & Gamble acknowledges that Adkison is a member of a protected class and that the position

-24-

went to a male with similar qualifications, Dennis Legault. (*See* Doc. 43, Ex. 1 at 56). However, Defendant disputes that Adkison applied for the position and that she was qualified for it. (*Id.*).

Defendant contends that Plaintiff never formally applied for the role and therefore cannot demonstrate that she was considered for and denied the position. (Doc. 43, Ex. 1 at 56). However, Plaintiff has produced a copy of her formal application dated December 6, 2007, the posted deadline for the position. (See Doc. 81, Ex. B at 1). The Court finds that Plaintiff timely applied for the position, or has at least evidenced a dispute in the facts as to this issue.

Defendant also argues that Plaintiff failed to meet the stated requirements for all applicants that they have been in their current role for at least eighteen months or have the support of their direct supervisor to apply. (Doc. 43, Ex. 1 at 56). While Plaintiff had been in her then current role for only one year, she had the support of her direct supervisor, Holli Christman, and therefore met the first qualification. (Doc. 59, Ex. D).

Defendant also asserts that Adkison was not qualified because she was not on the Marketing organization's "Ready to Promote List." (Doc. 43, Ex. 1 at 56). However, this requirement is Procter & Gamble's articulated reason for the denial of the promotion, and it is not to be considered at the *prima facie* stage of the McDonnell Douglas analysis. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 , 574 (6th Cir. 2003) (finding that considering the employer's allegation that the employee failed to meet qualifications

could not be considered during a *prima facie* stage because it would "deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext").

In determining whether Adkison has met the qualifications for the job, the Court "must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense." *Id.* Adkison has produced evidence that she had the support of her supervisor, was encouraged to apply by a senior manager in the in the Oral Care business, and met all the qualifications on the stated application. (Doc. 51 at 40; Doc. 81, Ex. B). The Court finds this evidence sufficient to establish the *prima facie* requirement that Plaintiff was qualified for the position and that despite her qualifications she was not selected.

Plaintiff has presented evidence showing that she was a member of a protected class, that she was qualified for and applied for a position, that despite her qualifications she did not receive the position, and that a male of similar or lesser qualifications was given the position. Therefore, the Court finds that Plaintiff has met her burden to establish a *prima facie* case of gender discrimination.

### b.    Title VII Retaliation

Plaintiff alleges that the denial of the promotion also constitutes retaliation for protected activity under Title VII and Ohio law. (Doc. 51 at 27). To establish a claim of retaliation for engaging in protected activity under Title VII,[16] Plaintiff must show that:

---

[16] Plaintiff's Ohio state law retaliation claims are analyzed in the same manner as her Title VII claims. *Wrenn v. Gould*, 808 F.2d 943, 500 (6th Cir. 1987).

(1) she engaged in protected activity; (2) her exercise of civil rights was known to the Defendant; (3) she was the subject of adverse employment action; and (4) a causal link existed between the protected activity and the adverse action. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).

Defendant alleges that Plaintiff cannot satisfy the first prong of the test and establish that she engaged in protected activity because she was denied the promotion in early 2008 and her attorneys did not formally complain to Procter & Gamble of discrimination until 2009. (Doc. 43, Ex. 1 at 49). However, Plaintiff contends that she asserted her rights in March 2006 via a complaint to Giovanni Giordano in human resources. (Doc. 51 at 28-29). Adkison also states that she told Dintenfass, Bolden, and Dietz in 2006 that they were discriminating against her in the handling of her maternity leave. (*Id.* at 29).

Defendant argues that these complaints do not constitute protected activity because they failed to rise to the threshold set in Title VII. (Doc. 78 at 4-5). Title VII prohibits any employer from discriminating against an employee because she has "opposed" any practice outlawed by Title VII. 42 U.S.C. 2000e-3(a). To oppose a practice within the meaning of Title VII, an employee must "resist or antagonize," "contend against," "confront," or "withstand" the conduct. *Crawford v. Metro. Gov't of Nashville and Davidson*, 555 U.S. 271, 276 (2009). The protections of Title VII's retaliation provisions apply only after the employee has made "an overt stand against suspected illegal

-27-

discriminatory action." *Lockett v. Marsh USA, Inc.*, 354 Fed. Appx. 984, 997 (6th Cir. 2009). Defendant argues that Sixth Circuit case law requires an "overt stand" against discriminatory action and that an informal complaint is not protected activity unless it identifies specific conduct as unlawful discrimination. (Doc. 43, Ex. 1 at 5). However, Defendant ignores the Supreme Court's recent ruling in *Crawford*, in which the Court held that the Sixth Circuit's view that opposition must be "active, consistent" behavior was too narrow a reading of the statute. *Crawford*, 555 U.S. at 277.

Additionally, Defendant's reliance on *Lockett* is misplaced. In *Lockett*, the court held that the plaintiff's performance review of another employee - in which she told her supervisors that the employee "was not embraced by her peers" because of her personality resulting from her "Peruvian culture" - did not rise to the level of protected activity because plaintiff did not clearly state that she believed the employee was being discriminated against. *Lockett*, 354 Fed. Appx. at 997. While *Lockett* concerned statements made in a performance review conducted in the normal course of business, Adkison reached out to human resources to discuss what she believed to be an unfair handling of her request for maternity leave. (Doc. 51 at 9). Further, Plaintiff claims that she told both human resources and her direct supervisors that "the plan to replace [Plaintiff] with Jain her was discriminatory." (Doc. 51, Ex. 2 at 3). Plaintiff's claims that she told both Human Resources and her supervisors that she felt she was suffering discriminatory treatment are sufficient to preclude summary judgment on the issue of protected activity.

Defendant next argues that even if Adkison's complaints constituted protected activity, she cannot satisfy the second prong of the *prima facie* case by demonstrating that the decisionmakers on the promotion denial knew of her protected activity. (Doc. 78 at 6). To satisfy a *prima facie* case, Plaintiff must show not just that the Defendant in general knew of her protected activity, but that the decisionmaker on the alleged adverse action knew of the activity as well. *See Frazier v. USF Holland, Inc.*, 250 F. Appx 142, 148 (6th Cir. 2007). Defendant contends that Bill Toler, the hiring manager for the position, had no knowledge of Plaintiff's complaints. (Doc. 78 at 7). While Toler testified that he had no knowledge of Plaintiff's previous complaints, he was copied on an email sent by Giordano to Charlie Pierce, the President of Oral Care, in which it was stated that Plaintiff "has come directly to you and me with a number of claims she was making during her NA assignment had it might happen again" (sic). (Doc. 59, Ex. 1 at 5). While Defendant has tried to minimize the significance of this statement by noting that Toler was merely copied on the email, Toler then forwarded the email to his subordinate with a comment about how "there is much more history to this situation than you were ever aware of." (*Id*. at 10). The email plainly establishes a genuine issue of material fact regarding what Toler knew.

Finally, Defendant argues that Plaintiff cannot establish a causal connection between her protected activity and the denial of the promotion because Toler was unaware of her protected activity. (Doc. 43, Ex. 1 at 50). As stated above, the Court

-29-

finds sufficient evidence to satisfy the *prima facie* requirement that Toler was aware of Plaintiff's complaints. Further, when Toler forwarded the Giordano email to Hull he also instructed Hull to stop speaking to Plaintiff about the position and to consult with Human Resources about Plaintiff's prior complaints. (Doc. 59 Ex. 5). Toler also stated that if a Band 3 employee (such as Adkison) were to be considered, they would need to be on the "Ready to Promote List." *(Id.)*. Drawing all reasonable inferences in Plaintiff's favor, the Court finds this evidence presents a genuine dispute as to whether Toler rejected Plaintiff's application because of her prior complaints.

Therefore, the Court finds that Plaintiff has established the elements of a *prima facie* case of retaliation with respect to the denial of the promotion to Associate Marketing Director for Oral Care.

### 2.   **Defendant's Non-Discriminatory Reason**

Plaintiff's showing of a *prima facie* case of both discrimination and retaliation now shifts the burden to Defendant to offer evidence of a legitimate, nondiscriminatory reason for the denial of the promotion. *Bryson*, 498 F.3d at 570. Here, Defendant meets that burden.

Procter & Gamble claims that Plaintiff was denied the AMD position because she did not meet the qualifications. (Doc. 43, Ex. 1 at 56). Specifically Defendant alleges that to qualify an applicant must have been in his or her position for at least eighteen months and also be on the marketing department's "Ready to Promote" list. *(Id.)*.

Because Adkison had only been in her position with Global Vicks for seven months at the time of application and because she was not on the Ready to Promote List, Procter & Gamble asserts that she failed to meet the objective qualifications for the job and was therefore properly denied the promotion. (*Id.*).

### 3. Plaintiff's Evidence of Pretext

Because Procter & Gamble has set forth a legitimate non-discriminatory reason for the denial of promotion, the burden now shifts back to Adkison to establish that Defendant's articulated reason was merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802. As noted above, Adkison must produce evidence from which the jury could reasonably doubt Procter & Gamble's explanation, and may do so by showing that the articulated reason (1) has no basis in fact; (2) did not actually motivate Defendant's conduct; or (3) was insufficient to warrant the challenged conduct. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400, n. 4 (6th Cir. 2009); *Dewes,* 231 F.3d at 1021.

Plaintiff argues that Procter & Gamble's articulated reason was pretextual because Toler manufactured the requirement specifically to preclude Plaintiff from qualifying. (Doc. 51 at 46). Plaintiff cites to an email sent November 15, 2007 from Giovanni Giordano to Charlie Pierce, copying Bill Toler, explaining that while Dave Hull had contacted Plaintiff directly as a candidate for the position, Procter & Gamble was "trying to revert the 'offer to be a candidate' for an intuitive number of good reasons." (Doc. 59, Ex. 5). Toler then forwarded the email to Hull, and explained that there was "history"

-31-

with Plaintiff that Hull was not aware of, that Hull needed to "back out of the situation,"

and that if a Band 3 employee (such as Adkison) were to be considered, they would need

to be on the "Ready to Promote List." *(Id.)*. Diane Dietz replied to this email chain that

"Bill is great! Thx for handling." *(Id.)*. Drawing all reasonable inferences in favor of the

non-moving party, the Court finds that there is a genuine issue of material fact as to

whether Toler added the requirement specifically in an effort to "revert" the offer to

Adkison to be considered for the position.

The Court finds that Plaintiff has met her burden to set forth a *prima facie* case of

gender discrimination and retaliation for protected activity and has provided sufficient

evidence that Defendant's articulated reason for its adverse action was mere pretext.

Accordingly, Defendant's motion for summary judgment on Plaintiff's claims of gender

discrimination and retaliation surrounding the 2008 denial of a promotion to Associate

Marketing Director for Oral Care is **DENIED**.

### C.   Performance Improvement Plan and Termination

Plaintiff claims that her termination was the result of gender discrimination in

violation of Title VII and Ohio Rev. Code. § 4112, retaliation for protected activity under

Title VII and Ohio Rev. Code § 4112, and FMLA retaliation. (Doc. 51 at 27, 41). Like

Plaintiff's claims concerning the reassignment of her duties to Jain and the denial of the

promotion to Associate Marketing Director for Oral Care, Plaintiff's claims concerning

her termination are all analyzed under the *McDonnell Douglas* test. *(See supra, n. 13)*.

-32-

1.    *Prima Facie* **Case**

    a.    **Gender Discrimination**

To establish a *prima facie* case of gender discrimination in the decision to terminate her, Plaintiff must prove: (1) she was female; (2) she was qualified for the job she held; (3) she suffered an adverse employment action; and (4) she was replaced by a male employee or was treated differently than male employees.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996).  Defendant does not dispute that Adkison was female, that she was qualified for the job, or that her termination was an adverse employment action.  (Doc. 43, Ex. 1 at 59).  The sole issue is whether Plaintiff was replaced by or treated differently than male employees.

Defendant argues that Plaintiff cannot establish a *prima facie* case because she was not replaced by nor treated less favorably than a male.  (Doc. 43, Ex. 1 at 51).  Defendant claims that Plaintiff cannot establish that she was replaced by someone outside her protected class because Procter & Gamble did not fill her role after she left.  (*Id.*).  Plaintiff offers no evidence to refute this statement, and the Court therefore focuses on whether Plaintiff was treated less favorably than similarly situated male employees.

Defendant also alleges that Plaintiff cannot establish that she was treated differently than male employees because she cannot identify another Band 3 employee in the marketing division who was deemed uncompetitive and not promotable by Leigh Radford and was therefore terminated in accordance with Procter & Gamble's up or our

-33-

policy. (Doc 43, Ex. 1 at 51).  Plaintiff argues that the marketing department had at least

one "career" Brand Manager, Doug Stuckey, and was therefore not a strictly up or out

organization.  Plaintiff had "very strong development at a brand manager level in the way

of executing, delivering, collaborating, getting the results," but Procter & Gamble

allegedly terminated her because she was not promotable.  (Doc. 51 at 42).  Plaintiff

argues, and the Court agrees, that allowing a male Brand Manager to stay on in a career

role while terminating Plaintiff because she was not promotable constitutes disparate

treatment of similarly situated employees outside the protected class.  (*Id.*).

Plaintiff also claims that the fact that the males who previously or subsequently

held her Brand Manager position in Oral Care advanced immediately to Associate

Marketing Director after the role, while Adkison did not, is evidence that Procter &

Gamble's determination that she was not promotable was driven by gender

discrimination.  (*Id.*). But Plaintiff has failed to provide any evidence that these

employees were similarly situated to Plaintiff.  The mere fact that they held the same

position and were promoted, while she was not, is not sufficient to establish more

favorable treatment to members outside the protected class. *See Clayton v. Meijer, Inc.*,

281 F.3d 605, 610-611 (holding that comparators must be similarly situated in all relevant

respects).  Plaintiff has set forth no evidence on the time each of these employees spent in

the role, their results, the availability of the Associate Marketing Director position to

which they were promoted.  Based on the evidence provided by the Plaintiff, the Court is

-34-

unable to conclude that the promotion of other male employees to the Associate Marketing Director position for Oral Care was the result of gender discrimination.

Finally, Adkison argues that she can satisfy the fourth prong of the *prima facie* test by showing that she was punished for failing "to conform to social expectations concerning how a woman should look and behave" and that she would not have been terminated had she been a male exhibiting those same characteristics. (Doc. 51 at 43(citing *Smith v. The City of Salem*, 378 F.3d 566, 573 (6th Cir. 1989). Title VII affords protection not just from discrimination on the basis that Plaintiff is a woman, but also "discrimination because she failed to *act* like a woman." *Id*. (emphasis in original).

Adkison claims that Procter & Gamble management believed that she did not properly conform to their expectations of how women should behave, specifically, that she was punished because she failed to meet their "expectation that women want to focus on child rearing rather than career, and should be nurturing, good communicators, non-aggressive, and emotional." (Doc 51 at 50). In support of this argument, Adkison points to the fact that Christman was "surprised" at Adkison's "lack of enthusiasm" for adopting a part time schedule after her fourth maternity leave, and claims that other supervisors called her "high-maintenance" and inferred that she was a gossip. (*Id*. at 50-51).

Additionally, Adkison was described as "bullish," "obstreperous," "combative," and "too rational." (*Id*. at 51). In contrast, Adkison argues that these traits were not considered deficiencies in male colleagues. (*Id*.). While colleague Matt Kemme had

-35-

problem areas similar to those allegedly possessed by Adkison (a tendency to "over-lead" and "over-dictate"), he was given the highest possible annual rating and was considered a "rock star." (*Id*.). As the Supreme Court noted in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." Plaintiff has presented sufficient evidence at the summary judgment stage to create a genuine issue of material fact regarding whether Procter & Gamble viewed her allegedly aggressive tendencies differently than they viewed those same characteristics of her male colleagues.

The Court finds that Plaintiff has established sufficient evidence that she was treated less favorably than members outside of her protected class in both the denial of a career position and the handling of her allegedly aggressive and combative tendencies and has therefore established a *prima facie* case of gender discrimination.

### b.    Title VII Retaliation

Plaintiff also alleges that her termination constitutes retaliation for protected activity under Title VII and Ohio law. (Doc. 51 at 27). To establish a claim of Title VII retaliation for with regard to her termination, Adkison must show (1) she engaged in protected activity; (2) her exercise of civil rights was known to the Defendant; (3) she was the subject of adverse employment action; and (4) a causal link existed between the protected activity and the adverse action. *Wrenn*, 808 F.2d at 500.

Procter & Gamble seeks summary judgment on the grounds that Plaintiff cannot satisfy the second and fourth prongs of the test , arguing that Plaintiff cannot establish that Radford knew of Plaintiff's protected activities nor establish a causal connection between her protected activities and her termination. (Doc. 43, Ex. 1 at 52). To establish a causal connection between the protected activity and her termination, Adkison must produce evidence allowing for an inference that the adverse action would not have been taken without the employee's engagement in the protected activity. *Allen v. Mich. Dep't of Corrs.*, 165 F.3d 405, 413 (6th Cir. 1999). Such an inference can be created by evidence of temporal proximity or the disparate treatment of similarly situated employees. *Id.*

Here, Defendant argues that Adkison cannot establish causation because Radford placed her on a PIP, offered her a voluntary separation package, extended the PIP, and warned her that she would recommend termination before Radford learned of Plaintiff's discrimination claim. (Doc. 43, Ex. 1 at 53).

Defendant's position assumes that Adkison had not engaged in protected activity prior to her attorney's letter to Defendant's counsel in June 2009. As discussed above, Adkison first asserted her rights in March 2006 via a complaint to Giovanni Giordano in human resources and comments to Dintenfass, Bolden, and Dietz that they were discriminating against her in the handling of her maternity leave. (Doc. 51 at 28-29).

-37-

While Plaintiff complained prior to placement on the PIP, Plaintiff must also demonstrate that Radford and Christman had knowledge of those complaints. *See Frazier v. USF Holland, Inc.*, 250 F. Appx 142, 148 (6th Cir. 2007) (decisionmakers must have knowledge of the protected activity). While there is a dispute as to whether Christman or Radford was the party responsible for placing Plaintiff on the PIP that resulted in termination, Plaintiff has presented ample circumstantial evidence under either scenario to create an inference of a causal link.

Radford admits that she and Dintenfass had a close friendship and that she spoke with Dietz about Dintenfass, Adkison, and the events in Oral Care. (Doc. 51 at 37). Construing the evidence in the light most favorable to Plaintiff, it is plausible to conclude that Radford knew from Dietz or Dintenfass about Plaintiff's prior claims of discrimination.

Christman has admitted that she knew that Dintenfass refused to hold Adkison's position open during her maternity leave and that Adkison believed Dintenfass used her maternity leave to replace her with Jain. (Doc. 51 at 36). Christman also specifically asked Dintenfass for the "whole story" on Adkison. (*Id.*). Drawing all reasonable inferences in Plaintiff's favor, these facts create a genuine issue of material dispute as to whether the termination was caused by Plaintiff's complaints of discrimination.

The Court therefore concludes that Plaintiff has presented sufficient evidence to create a genuine issue of fact regarding whether Radford knew of Plaintiff's prior

complaints of discrimination and whether there was a causal link between Plaintiff's

complaints and her termination. Therefore, Defendant's motion for summary judgment

on Plaintiff's claims for retaliation with regard to her termination is **DENIED**.

### c. FMLA Retaliation

Finally, Plaintiff claims that her termination was in retaliation for the exercise of

her FMLA rights. (Doc. 51 at 38). To state a *prima facie* case of FMLA retaliation,

Plaintiff must establish that (1) she was engaged in an activity protected by the FMLA;

(2) the employer knew that she was exercising her rights under the FMLA; (3) after

learning of her exercise of FMLA rights, the employer took an employment action

adverse to her; and (4) there was a causal connection between the protected FMLA

activity and the adverse employment action. *Killian v. Yorozu Auto. Tennessee, Inc.*, 454

F.3d 549, 556 (6th Cir. 2006).

There is no dispute that Plaintiff engaged in activity protected under the FMLA

when she took maternity leave in 2006 and again in 2008, nor that Procter & Gamble was

aware of Adkison's exercise of her FMLA rights. The parties are in dispute only as to

whether Plaintiff suffered an adverse employment action and whether there was a causal

connection between Plaintiff's protected FMLA activity and her termination. (Doc. 43,

Ex. 1 at 61).

Defendant first argues that a PIP is not an adverse employment action. (Doc. 43,

Ex. 1 at 51). However, the Court agrees with Plaintiff's argument that the Defendant is

viewing the PIP in isolation, while the action is properly considered in context. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 ("[A] discrimination analysis must concentrate not on the individual incidents, but on the overall scenario."). Employment actions must be examined from the perspective of a"a reasonable employee in the Plaintiff's position" and Plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Sante Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006).    The PIP was a step on the path towards Plaintiff's termination, and in the same meeting it was offered, Plaintiff was also offered a separation package. (Doc. 43, Ex. 1 at 20).  The Court finds that this conjunction, along with the history of other incidents, creates a genuine issue for the jury as to whether a reasonable employee in Plaintiff's position would have been dissuaded from making a charge of discrimination. (*See also* Doc. 51 at 37-38).

Defendant also argues that the eight month lapse between Adkison's final maternity leave and her placement on a PIP precludes a finding of causation as a matter of law. (Doc. 43, Ex. 1 at 45 (citing *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)).  Defendant misstates the law.  While a short interval between the protected activity and alleged retaliatory action can be sufficient to establish causation, a longer interval does not preclude a finding of causation.  Rather, in that case a plaintiff must set forth some other evidence of retaliatory motive.  *See id*. (Finding that extremely

-40-

close temporal proximity could permit an inference of retaliatory motive, but also recognizing that other evidence is often necessary to permit the inference.). Here, Plaintiff has set forth evidence of the extreme attention paid to Plaintiff's four pregnancies in five years, including the difficulty she had in planning her 2006 maternity leave with Dintenfass and the notes taken by Damali Orozco, a Human Resources manager, on Plaintiff's maternity leaves and whether Procter & Gamble had sufficient justification to conclude that she was not promotable. (Doc. 51 at 39). Plaintiff has therefore presented sufficient evidence of a retaliatory motive to state a *prima facie* case for FMLA retaliation.

### 2. Procter & Gamble's Legitimate Non-Discriminatory Reason

Because Plaintiff has established a *prima facie* case with regard to gender discrimination in the decision to terminate her, the burden shifts to Procter & Gamble to set forth a legitimate non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802.

Defendant asserts that Plaintiff was terminated because she was not competitive with her peers and failed to improve after the implementation of a performance improvement plan. (Doc. 43, Ex. 1 at 56). Specifically, Defendant contends that Radford made the decision to terminate Plaintiff due to Plaintiff's inability to collaborate effectively, refusal to accept or internalize feedback, and lack of ability to engage, energize, and demonstrate leadership skills at the AMD level. (*Id.*). Procter & Gamble has thus satisfied its burden under the *McDonnell Douglas* test.

-41-

### 3. Plaintiff's Evidence of Pretext

Because Defendant has articulated a legitimate non-discriminatory reason for Plaintiff's discharge, the burden now shifts back to Plaintiff to demonstrate that Defendant's articulated reason is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.  As with Plaintiff's other claims, she may demonstrate pretext by showing that the articulated reason (1) has no basis in fact; (2) did not actually motivate Defendant's conduct; or (3) was insufficient to warrant the challenged conduct. *Dewes*, 231 F.3d at 1021.

Plaintiff challenges Defendant's motion for summary judgment on two grounds. First, Plaintiff argues that there are issues of credibility which must be determined by a jury.  Second, Plaintiff asserts that her failure to meet Radford's subjective criteria were not the true reason for her termination.  (Doc. 51 at 54, 56).

Adkison argues that the question of pretext is best left to the jury because Defendant's articulated reasons are based on the use of "wholly subjective" performance measures.  (Doc. 51 at 54).  Procter & Gamble correctly notes that subjective employee evaluations are neither unlawful nor pretextual *per se*.  *See Browning v. Dep't of the Army*, 436 F.3d 692, 697 (6th Cir. 2006).  However, the Sixth Circuit has cautioned that subjective criteria "provide a ready mechanism for discrimination" and must bear close scrutiny.  *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 93 (6th Cir. 1982).

-42-

Plaintiff relies on *Grace v. University of Cincinnati,* No. 1:10-cv-315 (S.D. Ohio Aug. 19, 2011) (Doc. 51, Ex. H)  to allege that a termination based on an employer's subjective criteria requires a jury determination of the employer's credibility.  In *Grace*, the court held that the employer's subjective determination that the plaintiff was "in over his head" required the issue of pretext to go to the jury, noting that the defendant's "reliance on subjective factors is inscrutable and not subject [to] validation by any means except by judging her credibility."  *Grace* at 15.

Similarly, Radford's criticisms of Adkison were based on Radford's subjective determinations that Adkison was "not competitive with her peers."  (Doc. 43, Ex. 2 at ¶ 115).  Radford based her ratings and poor reviews of Plaintiff's efforts on her performance improvement plan on Radford's views that Plaintiff was unable to internalize feedback, lacked the ability to engage, and failed to demonstrate leadership skills.  (Doc. 43, Ex. 1 at 56).  Adkison challenges Radford's credibility, and asserts that her stated reasons were fabricated to conceal the discriminatory motive for Adkison's termination.  (Doc. 51 at 49).  As in *Grace*, Radford's evaluations are "inscrutable" and the issue of pretext can only be determined by weighing Radford's credibility.

Therefore, the Court finds that Plaintiff has presented a genuine issue of material fact regarding Radford's credibility, which therefore requires a jury determination of whether Procter & Gamble's stated reason for Plaintiff's termination was merely a pretext to conceal a true discriminatory motive.

-43-

The Court finds that Plaintiff has adequately established a *prima facie* case for gender discrimination, retaliation for activities protected under Title VII and Ohio Rev. Code § 4112, and FMLA retaliation with regard to her termination. The Court also finds that Plaintiff has presented sufficient evidence that Procter & Gamble's articulated reason for her termination was pretextual. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's claims for gender discrimination in the decision to terminate her is **DENIED**.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 43) is **GRANTED IN PART** and **DENIED IN PART**. Specifically:

1)     Defendant's Motion for Summary Judgment on Plaintiff's FMLA interference claim is **GRANTED**;

2)     Defendant's motion for summary judgment on Plaintiff's claim of FMLA retaliation with regard to her 2006 maternity leave is **DENIED**;

3)     Defendant's motion for summary judgment on Plaintiff's claims of gender discrimination under Ohio law and Title VII and  retaliation under Ohio law and Title VII with respect the denial of a promotion in 2007 is **DENIED**;

3)     Defendant's motion for summary judgment on Plaintiff's claims of gender discrimination under Ohio law and Title VII, retaliation under Ohio law and Title VII, and FMLA retaliation with regard to her termination is **DENIED**.

**IT IS SO ORDERED.**

Date:  December 19, 2011                    *s/ Timothy S. Black*
                                            Timothy S. Black
                                            United States District Judge